Gary M. SPIVEY, Plaintiff,

v.

The B.F. GOODRICH COMPANY, et al., Defendants.

Civil Action No. 01–757–JBC.

United States District Court,
W.D. Kentucky,
Louisville Division.

Feb. 5, 2003.

Dennis C. Burke, Louisville, KY, for Plaintiff.

David L. Hoskins, Frost Brown Todd, LLC, Louisville, KY, Carolyn K. Seymour, Jonathan S. Forman, Duvin, Cahn & Hutton, Cleveland, OH, for Defendants.

### MEMORANDUM OPINION AND ORDER

COFFMAN, District Judge.

This matter is before the court on the parties' cross-motions for summary judg-ment. The court, having reviewed the rec-ord and being otherwise sufficiently ad-vised, will grant summary judgment in favor of the defendants.

The plaintiff, Michael Spivey, contends that the defendants discriminated against him on the basis of a disability in violation of the Kentucky Civil Rights Act ("KCRA"), KRS 344.010 *et seq.* The plain-tiff was terminated by defendant The B.F. Goodrich Company ("B.F.Goodrich") on February 28, 2001. The plaintiff had been an employee at the B.F. Goodrich Bell Lane plant for twenty-seven years. At the time of his termination, the plaintiff was employed as a shift supervisor, a position which he had held for several years. Dur-ing the course of his employment, the plaintiff experienced significant medical problems that necessitated extensive leaves of absence, which were granted by B.F. Goodrich. The plaintiff was on a leave of absence due to his medical prob-lems when he was notified of B.F. Good-rich's intention to terminate his employ-ment.

Prior to his termination, the plaintiff had received a "needs improvement" rating on his 1999 performance evaluation, conduct-ed by Operation Supervisor Richard Cro-nin. The evaluation included typed com-ments, stating:

"The circumstances regarding [the plaintiff's] time away from work in early May requires further explanation. The lack of communication in the early stages of his medical leave presented a problem in arranging proper shift cover-age. [The plaintiff] was off work for 7½ months this year, thereby resulting in an evaluation that needs improvement against performance standards."

After this review, B.F. Goodrich docu-mented further problems with the plain-

tiff's performance. The plaintiff received a written warning for failing to report or call in for a scheduled shift on November 12, 2000. On December 11, 2000, the plaintiff failed to report to work on time to relieve the shift supervisor on duty. On December 12, 2000, he failed to attend a scheduled hazardous materials training class with his shift.[1]

The plaintiff was placed on a Marginal Employee Action Plan ("MEAP")—a tool used by B.F. Goodrich to put employees on notice that their performance has reached a point where their continued employment is in jeopardy unless certain performance standards are met. This decision was made by Manufacturing Manager Alice Simpson, in consultation with Plant Manager Roger LaCosse and Human Resource Manager Tom Hedden. Notice of this action was provided to the plaintiff on December 30, 1999.[2] The plaintiff understood that further incidents would lead to the termination of his employment.

On December 31, 2000, the plaintiff was scheduled as the "on-call" shift supervisor from 3:00 p.m. to 11:00 p.m. As an on-call supervisor, the plaintiff was responsible for responding to calls or pages, including calls from the operator who was assigned "fire watch" duty at the plant. The fire watch operator paged the plaintiff to discuss a chlorine leak. At the time, the plaintiff was on a gambling boat. He did not respond to the page until the next morning.[3] Neither Simpson nor Cronin was aware of the incident when it occurred.

On January 3, Spivey contacted Simpson and informed her that he was unable to work due to back problems. He explained that the exact problem had not been diagnosed and that further tests were scheduled. The plaintiff also stated that he was scheduled to have surgery on January 12, 2001, but that the surgery could be delayed depending on the results of the tests. Simpson instructed the plaintiff to submit documentation of his condition to Human Resources Assistant Kim Reilly as soon as possible so that his leave could be processed. Simpson specifically requested that the plaintiff call her after he received his test results so that she would have a better idea of the duration of his leave.

The plaintiff made no additional calls to B.F. Goodrich regarding his surgery. On January 8, 2001, Reilly received a "Return to Work" form from the plaintiff's doctor that specified that the plaintiff would return to work on January 12, 2001. Reilly prepared a leave of absence letter to certify the plaintiff's leave through January 11, 2001. As in the many letters previously issued to the plaintiff on his prior leaves of absence, the letter explicitly informed the

---

1. The plaintiff contends that the training class conflicted with a vacation day that he had previously arranged. It appears that vacation days could be informally arranged among operation supervisors through agreements to cover each others' shifts. Such arrangements were not communicated to management, however, and the plaintiff admits that he never reported the conflict to his supervisors or attempted to make alternate arrangements. Instead, the plaintiff assumed that a make-up course would be offered.

2. The plaintiff points out that neither "Marginal Employee Action Plan" nor "MEAP" appeared in the notice provided to him. He does not dispute, however, that the substance of the plan—that his performance had been found to be unacceptable and that his employment would be in jeopardy if any further violations occurred—was communicated to him.

3. The plaintiff contends that his failure to call in was due to a pager malfunction. B.F. Goodrich points out that the number was on the pager when the plaintiff checked it the following morning.

plaintiff that if he needed to extend his leave, he was required to provide written instructions from his physician prior to the expiration of his current leave of absence.

On the morning of January 12, 2001, Simpson and Cronin learned of the plaintiff's failure to answer the fire watch operator's page on December 31, 2000. Simpson confirmed the incident and discussed it with Cronin, Lacrosse, and Hedden. A consensus that the plaintiff's employment should be terminated was reached at that meeting.

The plaintiff failed to report for his scheduled shifts on January 12, 13, and 14, 2001 because, unbeknownst to B.F. Goodrich, the plaintiff decided to disregard the tests recommended by his physician and proceed with the surgery on January 12, 2001. The plaintiff did not submit any documentation related to that surgery until January 15, 2001. Upon receiving that documentation, the plaintiff was granted leave retroactively for those dates.[4]

B.F. Goodrich contends that plant management did not learn about the plaintiff's failure to report for his January 12, 13, and 14 shifts until Monday, January 15, 2001. The plaintiff also did not report for his January 15, 2000 shift. On January 16, 2000, La Cosse, Simpson, Cronin, and Hedden met to confirm the decision to terminate the plaintiff's employment. The failures of the plaintiff to appear for his January 12–15 shifts and his failure to

properly document his leave were discussed. It was decided that the plaintiff would not be terminated until his leave of absence expired.

The plaintiff's leave of absence was ultimately extended through March 3, 2001. On February 15, Simpson, Hedden, and Cronin met with the plaintiff and informed him that he would be terminated effective March 4, 2001. The plaintiff was given a letter explaining that he was being terminated because he failed to live up to the requirements set out during the December 30, 2000 meeting by failing to answer the fire watch operator's page one day after the meeting and by failing to report for his January 12–15 shifts. The date of the plaintiff's termination was subsequently revised to February 28, 2001 to coincide with the sale of the plant to defendant Noveon (formerly PMD Group).

## II. Analysis

KRS § 344.040 provides, in relevant part:

It is an unlawful practice for an employer: (1) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment ..., because the person is a qualified individual with a disability....

 "The KRCA's disability discrimination provisions 'track the federal law and

---

4. The plaintiff complains that he was unfairly charged with "no shows" on January 12, 13, and 14 because B.F. Goodrich ultimately approved his medical leave for those dates. The plaintiff did inform Simpson by telephone on January 3 that he was scheduled to have surgery on January 12, 2001. He does not dispute, however, that he represented that the occurrence of the surgery was contingent on further test results or that Simpson directed him to submit the appropriate paperwork so that his leave could be processed. The plain-

tiff also does not dispute that, prior to January 15, 2001, the only documentation he submitted to B.F. Goodrich indicated that he could return to work on January 12, 2001 and that B.F. Goodrich thus had approved his medical leave only through January 11, 2001. That B.F. Goodrich granted leave for January 12, 13, and 14 retroactively does not show that the plaintiff complied with company procedures for obtaining medical leave for his January 12 surgery.

should be interpreted consonant with federal interpretation.'" *Summers v. Middleton & Reutlinger, P.S.C.*, 214 F.Supp.2d 751, 755 (W.D.Ky.2002) (*citing Meyers v. Chapman Printing Co.*, 840 S.W.2d 814 (Ky.1992)). The plaintiff bears the initial burden of establishing a prima facie case of discrimination by the defendant. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, *Terbovitz v. Fiscal Court*, 825 F.2d 111, 114–15 (6th Cir.1987) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523(1985)), or by showing the existence of circumstantial evidence which creates an inference of discrimination, *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Under the latter approach, the plaintiff must show (1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992); *see also McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 265 (6th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987). The fourth element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably. *Mitchell*, 964 F.2d at 582–83. Once the plaintiff has established a prima facie case, which creates a presumption that the defendant unlawfully discriminated against the plaintiff, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the plaintiff's termination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Chappell*, 803 F.2d at 265. If the defendant offers a legitimate reason, the burden shifts back to the plaintiff to demonstrate that the discrimination was a determinative factor in his termination. *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817. However, the ultimate burden of persuasion always remains with the plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

## A. Noveon (PMD Group, Inc.)

■ KRS § 344.040 prohibits discrimination by employers. The plaintiff claims that he was discharged from his position with B.F. Goodrich due to his alleged disability. Regardless of the merits of his claim against B.F. Goodrich, it is clear that the plaintiff cannot recover against defendant Noveon. The plaintiff admits that his employment was terminated on February 28, 2001 (before Noveon assumed control of the plant),[5] that he was never employed by Noveon, that no one ever represented

---

**5.** While the plaintiff was originally informed that his discharge would be effective March 4, 2001, that date was later revised by defendant B.F. Goodrich to February 28, 2001. This change reflected the fact that, effective February 28, 2001, the plant at which the plaintiff worked was sold by B.F. Goodrich to Noveon. The plaintiff argues that the modification of his termination date indicates collusion between Noveon and B.F. Goodrich to terminate his employment. Despite having ample opportunity to conduct discovery, the plaintiff has produced no evidence that B.F. Goodrich and Noveon ever communicated regarding the plaintiff's termination at all, much less conspired to terminate the plaintiff because of his disability. The plaintiff's conclusory allegation of conspiracy is insufficient to withstand summary judgment. *McDonald v. Union Camp*, 898 F.2d 1155, 1162 (6 th Cir. 1990) ("mere conclusory allegations are not sufficient to withstand a motion for summary judgment").

to him that he was employed by Noveon, and that he never received a paycheck from Noveon. Given that the plaintiff was never employed by Noveon, his claim that Noveon unlawfully discharged him must fail.[6] Accordingly, the court will grant summary judgment in favor of Noveon.

## B. B.F. Goodrich

Even assuming, without deciding, that the plaintiff could establish his prima facie case, the court finds that B.F. Goodrich is entitled to summary judgment because the plaintiff cannot prove that B.F. Goodrich's proffered reasons for terminating his employment were pretextual.

B.F. Goodrich contends that the plaintiff was terminated due to his repeated violations of company policies. It is undisputed that the plaintiff failed to report to work on November 12, 2000; failed to report to work on time on December 11, 2000; failed to attend a scheduled HazMat training on December 12, 2000; failed to answer a page while on fire watch on December 31, 2000; and failed to submit documentation for his medical leave until after he had missed three shifts on January 12–14, 2001. The defendant points out that the last two incidents occurred immediately after the plaintiff was notified, on December 30, 2000, that his performance had been unsatisfactory and that any additional violations of company policy could result in termination.

■ In order to prove that B.F. Goodrich's reasons for terminating his employment were pretextual, the plaintiff must prove that the proffered reasons have no basis in fact, that they did not actually motivate B.F. Goodrich's actions, or that they were insufficient to motivate B.F.

Goodrich's actions. *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 883 (1996). The plaintiff has not identified evidence that would allow a reasonable jury to conclude that B.F. Goodrich's reasons for terminating his employment were pretextual.

■ The plaintiff has presented no evidence that the reasons allegedly relied on by B.F. Goodrich in deciding to terminate the plaintiff's employment have no basis in fact. While the plaintiff disputes the seriousness of the infractions cited by B.F. Goodrich,[7] he does not dispute the underlying facts.

Nor has the plaintiff identified evidence that would allow a jury to conclude that the reasons cited by B.F. Goodrich did not actually motivate it to terminate his employment. The plaintiff argues that the real reason that B.F. Goodrich terminated his employment was his disability, not his work performance. He fails, however, to present sufficient evidence to support that claim. The only evidence put forward by the plaintiff consists of a comment from his 1999 employment evaluation and the fact that the plaintiff was discharged while he was on medical leave.

The plaintiff's 1999 performance evaluation—given to him during a meeting on April 3, 2000—stated in part: "[The plaintiff] was off work for 7½ months this year, thereby resulting in an evaluation that needs improvement against performance standards." The plaintiff argues that this statement is direct evidence of discrimination because it shows that his poor performance evaluation was due, at least in part, to the amount of medical leave taken by the plaintiff in 1999. The court disagrees. While the statement could be read in such

---

**6.** The plaintiff does not contend that he ever applied for a position with Noveon, so he cannot claim that Noveon refused to hire him because of his alleged disability.

**7.** *See infra* notes 1–4.

a way, the court finds the statement to be ambiguous.[8] When considering statements allegedly showing employer bias, the court is to consider "whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination." *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir.1994). In this case, not only was the single statement ambiguous, but it was made more than nine months before B.F. Goodrich decided to terminate the plaintiff's employment. Given the remoteness of the statement, the plaintiff cannot show that it entered into the decision-making process leading up to his termination. Such an isolated and abstract comment is not sufficient to support a finding of discrimination. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir.1993)(comments made a year before plaintiff's termination that plaintiff was too old for position and that she would be plant manager if she were younger were too remote to have influenced termination decision).

Further, that the plaintiff was terminated while on medical leave does not indicate that the termination was motivated by the plaintiff's alleged disability. The decision to terminate the plaintiff was made roughly two weeks after the plaintiff failed to respond to the fire watch operator's page and within days of the plaintiff's failure to appear for his January 12–14 shifts.[9] That the plaintiff was on leave when the decision was made, in and of itself, does not

support an inference that B.F. Goodrich's decision to terminate him was related to his alleged disability.

The plaintiff also alleges that other similarly situated non-disabled employees were treated more favorably than he, but he has failed to submit sufficient evidence to create a genuine issue of material fact on that issue. "To be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Hollins v. Atlantic Co., Inc.* 188 F.3d 652, 659 (6th Cir.1999) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)).

The only evidence adduced by the plaintiff is a statement by Cronin that Cronin had never been involved in a decision to terminate a salaried employee and a statement by LaCrosse that, while other employees have failed to return pages, LaCrosse could not name another employee who was fired for failing to do so. While other employees may not have been terminated for failure to answer a page, the plaintiff has not shown that any of these employees were supervisors, as was the plaintiff, or that any of these employees had a substantial record of attendance problems, as the plaintiff did, or that any of these employees had been put on notice, via the MEAP or otherwise, that their jobs would be in jeopardy if they failed to comply strictly with company expectations.

---

8. As B.F. Goodrich urges, the statement could easily be read to indicate that the problems with plaintiff's performance in 1999 were excessive considering that the plaintiff worked for only 4½ months during that year.

9. Simpson and Cronin testified that they did not learn of the December 31, 2000 incident until January 12, 2001. The final decision to terminate the plaintiff was made four days later, on January 16.

Further, the fact that Cronin had not been involved in another decision to terminate a salaried employee does not indicate that B.F. Goodrich had never terminated such an employee. Accordingly, the plaintiff has submitted no evidence that he was treated less favorably than a similarly situated non-disabled employee.

Finally, the plaintiff cannot show that the reasons cited by B.F. Goodrich were insufficient to motivate it to terminate his employment. On December 30, 2000, B.F. Goodrich provided the plaintiff with clear notice that his absences and poor communication were unacceptable, and that any further incidents would be considered a sufficient basis to terminate his employment. December 31, 2000, the next day, the plaintiff, while on call, failed to respond to a page from a fire watch operator. Shortly thereafter, the plaintiff failed to request medical leave properly and failed to show up for four scheduled shifts. The plaintiff has presented no evidence other than his own disagreement with B.F. Goodrich's judgment about the seriousness of the incidents, and that disagreement alone is insufficient to raise a genuine issue of material fact as to whether the reasons for termination supplied by B.F. Goodrich were pretextual. *Majewski v. Automatic Data Processing*, 274 F.3d 1106, 1116–17 (6th Cir.2001) (employee's disagreement with employer's honest business judgment regarding his work does not create sufficient evidence of pretext in the face of substantial evidence that employer had reasonable basis to be dissatisfied).

While the plaintiff vigorously maintains that B.F. Goodrich terminated him because of his alleged disability, that conclusory allegation alone is insufficient to withstand the defendant's motion for summary judgment. *McDonald v. Union Camp*, 898 F.2d 1155, 1162 (6 th Cir.1990). As the plaintiff has failed to identify evidence that would allow a jury to find that B.F. Goodrich's asserted reasons for terminating his employment were pretextual, B.F. Goodrich is entitled to summary judgment. Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment is **GRANTED** and the plaintiff's motion for summary judgment is **DENIED**.